May it please the court. My name is Joseph Hohenstein and I represent the petitioners in this case. I respectfully request to reserve five minutes if necessary for rebuttal. First, we thank the court for ordering oral argument to address the Board of Immigration Appeals continuing failure to provide a functioning and consistent standard that will allow us to assess asylum cases that are based on membership in a particular social group. This court provided the direction to the board to do just that six years ago and in all honesty the board hasn't followed the court's direction. They're saying that they did it from the time of Acosta and that we just misread what they were doing. Correct. I'm having a little bit of trouble hearing this. They're saying that in fact we misread Acosta and that we implied something which they never intended as a test for the social group. Right. And what I think they've done is essentially come back to you with the same standard that you rejected in Valdiviezo and to put some window dressing on it. Before we, because we're going to spend a lot of time on this, this gets very complicated. In the end, no matter what we come up with, hasn't there been a settlement with FARC in Colombia that would make it safe for these That agreement or settlement has dissipated. It wasn't finalized this past winter. I thought it was initially turned out and then there was a new one done, a revised one. Right. If there is that change, it would be up to the government to propose if the case is remanded back and that may end up being a result in this case. But when I proposed potential settlement to the government, in part for that reason and also in part because the family situation, one of the sons is already a permanent resident and will be a U.S. citizen in a couple of years eligible to file. There's some other legal mechanisms whereby three or four family members are likely to receive permanent residence outside of this, but the youngest one. You said the yellow light went on and he was off for five minutes for rebuttal, but he had a 20 minute. He had 10, 10 and 10. So Susan's never wrong, okay. I'm just protecting you. But that issue is a factional one that would be addressed in remand and there will be a number of other things. I believe we were called here to address a particular social group and I want to deal with that in the individual context of this family issue. Yes. Yeah. And I want to be able to explain how the misapplication of that rule of law has affected this family's individual case and I think we'll go into more details about the general problems. But I see four different particular problems with the way the, what the MEVG case and that standard that was established by the board, which I think is just the same as the previous standard. Four particular ways that that has created problems for this family. One, there's a very confusing and vague nature to the standard at all and that comes in this tension between particularity and making sure that you are socially visible. Why doesn't that confusion arise from the nature of the, I think that's what he's going to argue is, why doesn't that confusion arise from the group that your client has decided to define and why isn't that something that we should look to in determining whether or not there is in fact a particular social group here? Right. I think part of the confusion is that it represents trying to pile too many of the other elements of the asylum standard and the asylum definition into particular social group. In other words, it's simultaneously trying to squeeze in concepts of nexus and on account of and it even includes elements of whether or not a government can control or is willing to control a non-governmental persecutor. If you know that almost all of the PSG cases arise out of cases with non-governmental prosecutors. So what has happened that created confusion when you add those two additional elements and you move away from a fairly simple standard that came from Acosta about the immutable characteristics. You are essentially bringing in additional elements of the refugee definition before their time. Wouldn't you agree that Acosta, if a test here is merely an immutable characteristic, or one which may be mutable, but as long as the person ought not to have to change. Correct. Given the evolution of claims that has arisen since Acosta, and even since Valdezzo, wouldn't you agree that things have gotten out of control in terms of the burgeoning of claims that are coming in, in terms of what constitutes a social group? Now that may or may not be definitive, but doesn't that suggest that some handle or some parameter you seek what constitutes a particular social group under the asylum definition? It does, but I would say that you don't want to take that out of context of utilizing the rest of the elements of the refugee definition, and again sort of putting everything into the PSG analysis, aside from elements of nexus, and aside from elements of whether prosecutors get controlled or not. I'm out of time right now. Well, this is a very complicated case, and an important case, but I don't think we're going to cut you off, or we're going to speak to that matter. We're trying not to be in a duplication and keep us here for dessert. I understand. So the one element that I think we also present that's unique here is the concept of past harm, and the concept of how that establishes a particular social group without it being persecution. I don't understand that. Okay. All right. If we look at immutable characteristic and the concept of ACOSTA with shared past experiences, the shared past experiences of being kidnapped or the focus of extortion, whether or not that original act was motivated on account of or by nexus to one of the factors, that is a shared experience that makes someone more susceptible. It's not within the statute. It's got to be on account of membership in a particular social group. Right, but that happens after you've established that there is a particular social group, not together with. You separate them out, and that's why you can establish past persecution. It's like not past persecution, but past shared experiences first, and then you determine as to whether the future harm that's feared, which could be different, and in this case it's different. The original harm that's extortion and kidnapping, the feared harm is death and the death threats. So it's not the same harm, but more importantly, it's the next step of the analysis, if not part of the same analysis, and you separate it out. So I'll step down because I have taken more of my time than I should. Thank you. Do you have anything? Okay. Ms. Heubner, is that how you pronounce it? Heubner, yes. Heubner. May it please the court. My name is Ashley Heubner, appearing as amicus curiae to urge this court to again reject the board's social distinction and particularity test. And I'd like to start out by addressing the question you raised, Judge McKee, about evolution of the claims and whether this requires some sort of parameter to be added to the particular social group test. The board claims that the social distinction and particularity test are necessary restrictions on the particular social group definition, but as this court demonstrated through Fatin, merely establishing membership in a particular social group does not get you to asylum. An individual must still meet all of the elements in the rigorous asylum test. Does that cut for you or against you? In other words, Acosta talks about immutable characteristics. And, well, start off with particular social group. And Acosta said that means particular social group means immutable characteristics. And you've got a lot of cases going different ways, and people are seeking more clarity, some more clarification. So to say that the group is socially distinct in some way and particular is already in the statute, what's wrong with that? I think there are a number of things that are wrong with that, Your Honor, one of which is the way the test has been defined by the board, defining the term social distinction and particularity. These are very difficult cases. Each case that comes up, they're difficult. And people are looking for a way, give me some guidelines that will be helpful to me in making these very difficult, particular, often unique situations. I think the board's problem, Your Honor, is that it's trying to provide clarity. It's focused on the wrong part of the test. Now, on the one hand, the board could provide more clarity about what constitutes a mutable characteristic that is one that someone should not be required to change. So, for example, if you are a former lawyer, is that a characteristic you should not be required to change? Is that different than being a former taxi driver, which the board has said is a characteristic that you can change. It's not a problem to stop being a taxi driver. I think that's one area where the board... Well, that was not a former, but taxi drivers... Yes, I apologize. Yes, being a taxi driver is something that you can be required to change. I think that's an area where they could have provided clarity. But on the other side of things, I think where the clarity should be focused on is that nexus element. As Petitioner's Counsel asserted, the nexus is really what does the critical work here in screening out cases that are not meritorious, asylum claims that are simply based on random or generalized criminal violence. Because if you have a claim that's merely based on random violence, you are not going to be able to establish that you were persecuted on account of your particular social group membership. The motivation for that violence is extracting money. And the person who is victimized, called persecuted, is of a group, in quotation marks, that would suggest to the persecutor that that person is ripe for being able to give them money, which is basically what we have here in the cases coming out of Salvador and wherever MS-13s work. That's what it is. It's extortion. It's kidnapping. But the reason for the kidnapping, you don't extort somebody who you know has no money, assuming that you want money in return for letting the person go. So doesn't it get you to the same place? It gets you to the same place, Your Honor. And I think there's two different issues there. On the one hand, generally the Board and most courts of appeals have found that being wealthy in and of itself is not a basis for a particular social group because it's not an immutable characteristic. But on the other hand, what you have in these cases is the initial reason that someone is targeted is different from the secondary reason once the person doesn't comply with the targeting. So, for example, if you are targeted for extortion and you say, no, I'm not going to pay, or no, I can't pay, the minute you oppose or resist the persecutor who is demanding that extortion, the subsequent targeting is on account of that past act of resistance, which is different from the initial reason that the persecutor may have targeted the individual believing that they have money. And I think that's a critical distinction. In every case that doesn't, you're going to get asylum. Merely establishing that you're a former member of something does nothing for you unless you can prove you'll be targeted for that reason and you can meet the other asylum elements. So saying that I'm a former lawyer doesn't get me anything unless the government starts to persecute former lawyers. And that's where the Texas really does the work in these cases to screen out those claims that are not meritorious. So it sounds like in what you just said, if I'm a former lawyer who is persecuted, then from the eyes of the persecutor, then there is a need for some type of distinction. No, Your Honor. I wouldn't quite say that because I think that is conflating the question of whether someone belongs to a social group with the question of whether someone was persecuted on account of that social group membership. And either way to think of this might be to look at it through the lens of one of the other protected grounds because it gets to be complicated when you think about it. But in your example, there is a social distinction, is there not? Potentially, Your Honor. I think it depends on the evidence in the case. In the eyes of the persecutor, yes. If the government starts to persecute former lawyers, that would seem to provide evidence that in the eyes of the persecutor, the government, former lawyers are a distinct group. That wouldn't necessarily indicate that former lawyers are distinct in the eyes of society, which is one of the problems with the board's task. They ignore the perspective of the persecutor and focus entirely on the perspective of society, which is very challenging to meet in many cases. When this concept first came up after Acosta back in 1999 in R.A., At that point in time, I think it was a bit of a mix, Your Honor. They looked at the perspective of the persecutor and they looked at the perspective of society. And that has been a point of confusion over the years. And, in fact, the Ninth Circuit and Enriquez-Rivas in the en banc court even pointed out that they thought that the perspective of the persecutor might be most critical here because there could be many situations where society in general is not aware of this particular group. It's only the persecutors who have decided to target this group for one reason. Let me shift gears to my colleague's opinion in Valdez-Gautamez. One could make an argument, and he can refute that if he wants, one could make the argument that the concern there, principal concern, is that it wasn't just social visibility. It was something else. And saying that it's visible via eyesight isn't right. And the Seventh Circuit has agreed with that. So the board comes back and says, well, we didn't mean it that way. And that helps, with a couple of other comments, maybe to clarify what we really meant. Because we're struggling to try to surround an issue here as to what particular social group means. If you clear up that social visibility isn't the key factor, isn't a factor, then what can we do? I mean, this does get shoved on deference, doesn't it? So long as it's a reasonable interpretation, yes, sir. And how is it unreasonable? I think there's several reasons why it's unreasonable. I think the first relates to the point that was identified in Valdez-Gautamez, the inconsistency with prior decisions. And despite board attempts to state that there is no inconsistency, the records in the prior decisions that the board decides to do not demonstrate that those social groups were socially distinct and particularly defined in the way the board sets out the test. The board has also continued to be inconsistent in its utilization of the test in decisions after matter of MEVG. So an example is the case of matter ARCG. It came out six months after MEVG. It involved a domestic violence-based claim. The social group involved married women in Guatemala in relationships they are unable to leave. In that case, the board said that group is socially distinct and particularly defined. Six months earlier, in the case of WGR, which is the companion case to MEVG, the board says the group of former Salvadoran gang members who have renounced gang membership is not socially distinct or particularly defined because that group could involve gang members of any age, background, or length of gang membership. But, of course, married women in Guatemala in relationships they are unable to leave also could involve women of any age, background, or length of membership. It doesn't get Chevron deference. I thought, answering the judge's question, you agreed that their interpretation subsequent to Valdevezio does get Chevron deference. No, Your Honor, I apologize. It should not get Chevron deference because it's not a reasonable interpretation. The board has not applied its test consistently. It does not provide any guidance or clarity. It does not do what a reason's test should do, which is have explanatory value for future litigates. But your answer to all that is just go back to Acosta. That's what's on page 22 of your brief. And that's what we said in Valdezio. They could do that. They could just go back to Acosta, explain the change, and then the whole issue goes away, at least from our vantage point it goes away. Right. We don't believe that in MEVG the board properly explained its new test, its rationale for the new test, and it purports a purpose for the new test that doesn't actually exist. So government claims that social distinction of particularity are necessary to prevent a floodgates problem. But that floodgates issue has already been resolved by the other elements in the asylum test. So, yes, I believe right now the best test that is consistent with case law, that is consistent with the statute and the other protected grounds is the Acosta test. Well, it's the easiest to apply, but it leads to a Pandora's box, which I think is what's motivating the BIA's fastidious insistence that they stick to Acosta. Because it does, and the change seems to be an attempt just in practical purposes to keep the lid on Pandora's box and keep some kind of manageable grip on these kinds of claims. And I spent my time with that. I think it's a straw man argument, Your Honor. I don't believe an actual floodgates problem exists, because the other elements work. It's just a brief weekend. We'll use the floodgates issue, particularly around gang issues and gang violence and recruitment for musicians. It's a burgeoning problem. I agree. There's more of these cases coming up as the problem of violence in those countries increases. But I think that floodgates problem is addressed by the other asylum elements. So, for example, in other cases that this court has found do not meet the particular social group test, the court has also found that those cases do not meet the other elements in the asylum test, so that there was no nexus or the individual couldn't establish an objectively reasonable belief that they would be persecuted if they go back. So the social distinction and particularity test caused immense confusion without actually doing anything to resolve the problem that the board claims to exist. Thank you, Your Honor. Thank you. May it please the Court. I'm Susie Green. I represent the Attorney General. This question of the interpretation of particular social group is an extremely important question in asylum law, more so than you would think from just looking at those words particular social group. We know it's an important question. And the reason why it's so important is because the effect that the interpretation of those words can have on the other words around them and, indeed, on the whole nature of the refugee definition. The refugee definition is organized around the principle of persecution. But it's not, on its face, it's not supposed to cover just persecution on account of any reason. It's only supposed to cover persecution on account of five protected grounds, race, religion, nationality, political opinion, and particular social group. And implicit in having that limiting clause is that there are supposed to be, you know, theoretically, there are other type of persecutions or mode of persecution that would not be a basis for asylum. In this court and the board, really, everyone has agreed that ordinary crime is not supposed to be a basis for asylum. That's clear starting out, but when the board... What if the ordinary crime is focused, let's keep it simple, by governmental actors against people who constitute a particular social group. Let's, for example, go back to Cuba. Because there we've already found, you've already found a particular social group with homosexuals. What if it was a policy to only rob and beat up and accost in the court of police officers people who are identified or on the registry of being homosexuals? So it doesn't emerge... Exactly, you're getting an important point, and that is that even you... It's too simple to say that crime is not covered because crime could happen because of these protected grounds. So the question here is how to distinguish race, religion, nationality, and political opinion and a particular social group from the ordinary crime. So as soon as the board started to engage... I'm troubled by the use of crime. Certainly. I'm troubled by the use of crime. If you get away from the MS-13 context, these are no longer crimes. They're ARCG where you have a domestic situation, and machismo was the word that the BIA used in defining the group and the reason to allow some kind of sanctuary from that group was because of machismo culture. That's not a crime. In fact, that's part of the problem. It's not a crime in this society. Right, okay. The ordinary... So the question is that you have to be able to, in a principled way, to distinguish the kinds of harm or persecution or crime that ought to be covered in that list from ones that are not. So as soon as the board engaged with this, it found that a particular social group is extremely broad and vague, and this court agreed with that in Fatin. It's so open-ended that if it was given its broadest interpretation, it would be completely open-ended. So everyone agreed that some kind of interpretation was necessary, and the board studied this and came up with a contextual method, the used and generous canon that it had used, and it tried to create criteria to find when a group was comparable to race. No problem with that. The board agreed with that. Immutable characteristics test by itself, it found problems. That test as well was not... It was vague, and it was leading to, as used as the sole criterion, it was not successful in pointing to characteristics that were as important in their society. So the test needed to be changed. Instead, tests needed to develop. They never took their back on the immutable characteristics test, but they added to it in ways that seemed calculated to produce results that were comparable to the other protected grounds. You just said they added to it. To me, that's the same as change. You were wise enough not to let me get rid of that, but you said they added to it. Sure. They supplemented. I don't mean to suggest that supplementing is not change. I don't want to argue that, and the board has never suggested it. But the reason the board insists on that they supplemented or that evolved is because they wanted to make clear that they never turned their back on immutable characteristics. They still used that. But they supplemented it with other criteria to try to capture what race, religion, nationality, et cetera, have in common. And what they said that they have in common is those are all characteristics that are so important in their society. They're socially salient. They're the fault lines in a society. And that particular social group in time and meaning, that was comparable to the other protected grounds. It sounds like you're making their argument. It sounds like Acosta created some problems. So to deal with the problems, and you wouldn't take it the way I had, as I said, so to deal with these additional problems, they tweaked, if you will, the test. And in tweaking the test, they added a few things, like social visibility, which may have been a problem in Delaware, Pennsylvania. In the first circuit, that was a problem. In the second circuit, that was a problem. So back away from social visibility and say, well, we didn't mean social visibility. We meant socially distinct. And you said that in such a way as to say, well, by saying socially visible, we didn't mean, to use your word, ocular visibility. We meant socially distinct, which says very little to me because, as they say, and I think it's page 606 of Valdiviezo, we specifically rejected that argument and said it was the same as social visibility. Your Honor, my understanding of Valdiviezo is that you weren't rejecting the social distinction test that the board has now explained where they were talking about social salience or the kind of characteristics that make factions in a society. You were rejecting the social visibility or the ocular visibility test because you believed that it was contrary to the board's previous holdings and you thought the board had not explained the reasons for the change. And in EBG, the board turned its attention and did a good job of explaining it. Let me explain it from Valdiviezo. I have trouble saying it quickly. This is page 606. Thus, the government's attempt to add gloss to the BIA's reliance on social visibility is at odds with the phrase itself, as well as the BIA's definition in INRAE-CA, which they mentioned, INRAE-AME, and JGE, and this is before we got to the more recent case of ARCG, which really seems to create problems for social visibility or socially distinct. ARCG is consistent with the method that they laid out. If you look at the board specifically, it looks at the evidence in the case and it says in this society, these characteristics in ARCG are socially distinct and they described how you can know what social... Age, age background, which were part of the things that were not done earlier because the groups that were being defined could be open to any age. I don't know why that's a problem, but in ARCG, you allow the group. My definition is open to that. Well, whatever the legal age of marriage in that society is, that and above, anyone of that age group could be in that particular group. Your Honor, the primary meaning, and I will say that particularity was not part of the holding in this case. I'd be glad to discuss particularity, but I think the basis for the board's decision in this case was social distinction. I'm sure I'm glad to talk about particularity. The board said clearly in MEVG that the primary meaning of particularity is delineation. To the extent that things like over breadth and so forth are relevant to particularity, there to whether the group seems to be clearly delineated. In ARCG, the board said, it looked at the evidence, it said that in this society, these terms have a well-understood definition, and this group would be particular in its society, and also that it would be socially distinct because those were important characteristics in the society. Let me ask a question. From whose eyes is it socially distinct? It is from society generally, and that's an important point. As you mentioned, okay, what if the persons doing the persecuting see a particular social group that isn't necessarily recognized by the society as a whole? For example, most societies as a whole probably wouldn't focus on engineers who do work in Columbia, but particular people within FARC might. The persecutors might. So why can't you say that from their eyes, they have put together a particular social group, circumscribed, limited, that society really doesn't know much about or care much about? The board talked about the question of whether social distinction is viewed from society's point of view or an individual persecutors in MEBG, and it said a couple of things about that. First, it said the reason why it needs to be viewed from society's point of view is because the point here is to try to distinguish particular social groups a priori before we get to the persecution. If you simply define it from the point of view, if you say that any time a persecutor picks on somebody, all we do is look at the reasons why the persecutor picked on that person and craft that into a particular social group, we're at the point where the persecution or targeting a person for persecution, it's making the particular social group, then the whole thing becomes circular. It's no longer a limited number of protected grounds. Well, it's a particular social group, and while most people in the society may not care, those in control do, in my example. You're saying the persons who are persecuted, the victims, have no ability to get asylum or withholding of removal in the United States. Your Honor, Judge McHugh was talking about earlier, we see that problem a lot in that, for instance, if somebody is wealthy, then a persecutor is looking for that. That's what they focus on, but that's for ordinary crime. What distinguishes ordinary crime from... We say ordinary crime, put the rabbit in the hat, because it may well be the, quote, ordinary crime, close quote, is only being manifested against this individual because of the, not in the literal sense, not in the term of art, social group that they belong to. And that's why I use the example of what if, in Cuba, there was a policy to only rob or extort homosexuals. It's an ordinary crime, but the person is only being a victim because of the membership in the group. Right. In that case, it would be more comparable to a hate crime, and a hate crime is more comparable to persecution, whereas a crime that's just motivated by financial gain or personal things like revenge, those are contrary, and that's what the effort is to try to distinguish those two. If any time a persecutor focused on a victim, then we could take whatever they were looking for and say, well, that's a particular social group. Then the whole nexus clause is not doing its job anymore. It's become simply persecution for any reason, and it's basic rule of statutory and treaty interpretation that you don't want a term to become superfluous. So race, religion, nationality, political opinion, and particular social groups should refer to preexisting groups in the society, not simply to whoever a persecutor picks as a victim. Well, why not just go back to the drug board, look at Acosta, and just say that we need to change what we did at Acosta because the innumerable characteristic definition is simply not working. And then you get Chevron deference under 13. A lot of this then resolves itself. Your Honor, they could have done that. I mean, I think the inquiry under Chevron and their administrative law is not for the court to come up with the way that things would have been best, but to see if what the agency did was reasonable. And I'll tell you that. There's another step in there, because if you're changing horses in Midstream under FOX, Supreme Court opinion, you have to give a reason for doing that. And we're here because, according to their submission, what you're trying to do is change Acosta without saying you're changing Acosta. If you were to go back and change Acosta and say we're changing Acosta and give a reasoned explanation for that under the team, then you get deference for whatever comes out of that. Your Honor, I mean, I think if you're asking me why is it reasonable for the board to do the way they did, I made an argument in my brief that I think is a good argument, and that is look at equal protection law. Equal protection law needs immutable characteristics. That's how you feel? That was a good argument? Yes, sir.  Okay. All right. I'm not commenting on what I hear. Because you're looking at groups there that have been historically persecuted, not in the asylum sense, but you're looking at where there's a historical context of social disenfranchisement. You don't necessarily have that here. Like the situation of women in Guatemala who are in abusive relationships. Very, very different from whether or not there's a history of racism or history of some other antagonism against an easily identified group. Well, Your Honor, in MEPG, when the board was talking about ways that you would establish social distinction, one of the things they talked about was a history of discrimination. They said historical animosities. Those things are not terribly different from what you would look at in equal protection. There's a lot of things beyond that. In Central Circles, all of the things that you're talking about as equal protection are in that group, but there are a lot of other things that are outside of that group that would not be there, to use your terms of how you prove this, would not be there because there's no formal policy, there's no formal law in any place. It's just a custom over time. It might be a fairly recent custom. One thing, and I don't want to necessarily sidetrack you from your argument, but a lot of these arguments are coming to me and I wanted to get your feedback. When you were mentioning your earlier argument, I kept thinking of intellectuals under Maoist China. I'm sorry, I didn't think intellectuals under Maoist China. Maoist China. There you have a situation where I don't know how you would define intellectual. I think, maybe we wouldn't know, but I think that we would agree that that is a group that underwent severe persecution. I don't know under your test how you would apply that test in that context. If someone came here, didn't want to go back, they were a college professor, and let's say they were self-remoted. They weren't a college professor, but they were self-taught and they did blogs. And they were afraid if they went back they'd be persecuted because the government was persecuting them. Sometimes that example is raised, and I think first I'd like to say that in the case of intellectuals and Maoist China,  Other people have used that example? We talk about these things a lot. I would think that that most clearly would be imputed political opinion because those were considered to be reactionaries. But intellectuals are going to be against the regime. But at any rate, that raises a question that often does come up, and that is what about if it's the government that sees a group as distinct as opposed to the society as a whole? That's a difficult question, and I don't want to get ahead of the board because the board hasn't really addressed it. But they kind of talked about it in MEPG. They said if the government views these people as a group, then the society is going to, I mean the government is a big actor in society. And if the government focuses on a group, and they use the example of I think employees of the Attorney General or something, then it's very likely that they would satisfy social distinction because whatever the government does, particularly in a totalitarian society, is going to be socially distinct and very high profile. So I think that intellectuals and Maoist China should be socially distinct, and I think that shows how the test works very well. So I'm trying to figure out what is left that we haven't discussed. I would just say that other courts that have looked at MEPG, that so far they have all found it reasonable. They've all deferred. This court, I think, has good reason to. They have not rejected it. They just haven't considered it. So I only meant the courts that have considered it. And in the list that I had in my brief, some had unpublished decisions. But certainly the Ninth Circuit considered the companion case to MEPG, WGR, in depth and affirmed that or called it in a published well-thought-out decision this year. So that's certainly the most high-profile test of the doctrines. I know that we haven't spent a lot of time talking about how this test applied in Hurtado's case, but I just want to mention, since we do have an actual lawsuit here, I just want to mention that the board's application of social distinction in Hurtado's case was consistent with its past precedent in that he said to the immigration judge, he said that my group is socially distinct because the folk will always know who I am. And the immigration judge said correctly that that's not the issue of whether the persecutor knows who you are. The issue is whether the group is socially distinct in the society as a whole. And he did not come up with any evidence that I think was probative of that. And the agency gave good reasons. One thing that got me here is proof of how in the heck do you prove this? In the brief, this is an example of this number of things, expert testimony, and then you mentioned press reports, which kind of boggled my mind. We get those a lot. We get those a lot in immigration records. In some societies, but in a lot of societies, I'm sure you don't get them. It almost calls for a fairly intense anthropological study of the society for some very remote societies. Togo may be an example of that. I mean, did you say Togo in the Kissinger case? There was all kinds of evidence in the Kissinger case. Because it's FGM, which is kind of a hot-button issue. Yes, but it's easier to imagine a situation where you've got a pre-literate society, and that's suggesting Togo is pre-literate, but you've got a very isolated society. There is no press, and if there is a press, the level of oppression is such that no person in the press in their right mind is going to write a story about this because they're going to disappear the next day. It just seemed like the kind of thing where, as in some kind of anthropological study, I don't know how you prove it. Well, as I said this in my brief, and maybe people like this better, that the whole nature of the test is that you're living with society. These are things that are supposed to be recognizable to you. So any applicant can testify about, you know, that this is an important subject in my society, and that is evidence, as well as the State Department. Take Kissinger. I just don't know. I don't know enough maybe to ask this question. But I can certainly imagine a situation where there's no doubt that that would be persecution under your test on account of a particular social group. But within that society, the level of consciousness is such that people just don't regard that as a social group at all. There are some people who oppose it, but they, being the people in the society, simply do not regard that as a social group within the meaning that we're talking about. That, to me, is not far-fetched at all, but I would imagine that's fairly common. Actually, Kissinger has been around for a long time. That was like 1997. The board considered that to be something that there was evidence that people that didn't have it were ostracized. So, I mean, evidence was not a problem in that case, and we still have lots of evidence. There's all kinds of evidence, but that doesn't, to me, satisfy the issue of whether or not people there would have identified with being in a group that identified with the notion that if they opposed it, they're going to be in trouble. That's not the same, in my mind, as identifying with being in a group. In other words, does this society bring a certain construct on the way people in very different societies would view something? That's the challenge of asylum law, is that equal protection law, we just look at the U.S., and asylum law, the board has to look at the world. That's exactly the reason. Are there any further questions? No, thank you. Thank you. Thank you again. As counsel's last comment about looking at the world, let's talk about ordinary crime and the idea that in the U.S. it means one thing and in the rest of the world it means another thing. The ordinary crime that's being found in cases like the Hurtados with the FARC, which is a web organization that also has criminal elements and has other motivations for its existence, is different than somebody getting arrested on the street in Philadelphia. The concept of ordinary crime in Central America with MS-18, an organized criminal activity that seeks to have social control and seeks to impose taxes on other people is different than ordinary crime. So I want to be clear about that. But my main point right now is the social distinction test is the same as a social disability test. MEG made that very clear. They said we are keeping the same requirements as we articulated in SEG and EAG and it's the same thing. We're just clarifying. But they say they never meant social visibility, eye visibility. Right. But the baseline elements of requiring particularity, which has a tension with generalized social perception. In other words, you can't get too particular or otherwise you're invisible to the society at large. And that was something that the concurrence in MEVG pointed out to say, wait a minute, do you remember the Kasinga case, which is women in Togo who are opposed to FGM? That's not a socially visible group. How that had been socially distinct also under this test. And it's not. That's part of the problem. This test doesn't provide for that consistency through all decisions. And that's also one of the reasons why I'm saying one of the things we ought to do is pull out particular social group from these other elements because I think in these other elements of the definition of refugee and asylee, that's where we find the concepts that we require, I think, as a country ruled by laws, which is that we do need to have some level of limitation. That's our fear when we broaden out particular social group too much is we are worried, you know what, we're going to open up these floodgates. Well, there's two triggers that would also serve as additional floodgates here. One is nexus, which is on the account. And the second is this concept of societal control or governmental control over the persecutors. One of the interesting things I found from the government's argument was if the government of these countries were undertaking these actions, if the government of these countries were identifying separate from what the society saw, we'd have no problem. Run that as a thought exercise to say if we were talking about the Colombian government doing these things to the Hortadas and the Parra family, what would we say about whether they were targeted, whether they were persecuted on account of. What we're really talking about here is the element of the ability or willingness of a government to control. And that's a separate triggering analysis. It's a separate piece of the analysis that ought to be done away from the particular social group analysis. And then one other point right now in terms of looking at the persecutors' perspective. And I would argue, and I think the government effectively acknowledged, and they might differ with me, but you review what they've said on this, and review more importantly what Board and the immigration judge said in their remarks citing MEBG that a persecutor's perspective will not be the sole determining factor. I would argue that the way that they applied that test, in this case at least, and in the majority of cases that I've seen citing MEBG, is they haven't just said we're not going to rely on it as a sole factor. We're not going to consider it at all. Because there was plenty of additional evidence in the Hortada case that there was social distinction, social identification. Otherwise, why would you have a kidnapping report that provided you with all statistics and the different categories of people and individuals who had been targeted by the FARC for kidnapping and extortion? But that report's in the record. That's evidence of what the society at large in Columbia sees. And so they've identified the group, whether or not they see the people. But, again, that I think ends up having to go into the separate analyses for nexus and for whether the government has control. The last piece that I've been thinking about, and this may or may not help the Court as it resolves these issues, but a thought experiment that I went through is to imagine a much smaller country. Let's imagine the schoolyard at Wilson Elementary School in Philly. And you've got your schoolyard bully. And whether he targets a kid for taking that child's lunch money or not, once the bully takes the kid's lunch money, you know there's more likelihood that that bully is going to come back. Now, that to me would establish a PSP. That's crime. That's not necessary. Right. Right. But the more important thing as to whether it constitutes an asylum claim, and a viable asylum claim, is what do you do after that? Why is the action continuing to happen? And, more importantly, do you see the teachers coming around? Let the government know about it and permit it to continue. Exactly. I don't think the thought experiment is going to help. It's not exactly general relativity. That thought experiment is not right. I understand. But, to me, the question is where are the teachers? And when we look at cases where these particular social group cases are coming up, in Columbia and in Central America, we're talking about weak central governments that don't end up policing or sort of ceding a significant portion of their area to these allegedly criminal enterprises. But they're really not. Thank you. Anything more?